UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GOULD PAPER CORPORATION,

              Plaintiff,          :                   07 CIV. 6087 (DC)

                       :                     ECF CASE

          -against-           :

                       :

ALEX GOMEZ and JOHN HUEMPFNER,

                       :

          Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF CARL MATTHEWS
## IN OPPOSITION TO MOTION TO TRANSFER

    CARL MATTHEWS, declares that:

    1.      I am the Executive Vice President and Chief Financial Officer of Plaintiff Gould Paper Corporation ("Gould"). I submit this declaration in opposition to Defendants' motion to transfer this matter to the district court in Florida. I have read the Complaint, which is annexed hereto as Exhibit A, as well as Defendants' motion to transfer.

### BACKGROUND

    2.      Gould is a New York corporation with its principal offices located at 11 Madison Avenue, New York, N.Y. Gould is what is known in the trade as a paper merchant. It is engaged in the business of selling various types of paper used in business, publishing and in the printing trades. Gould services its customers in two ways: either arranging for paper to be shipped directly from the mill to the customer; or from its own inventory.

3.    This action arises out of Gould's unincorporated division, Gould Paper Florida ("GPF"), which it operates out of Miami to service customers in Florida and the Carribean. Defendants John Huempfner ("Huempfner") and Alex Gomez ("Gomez") were commission salespersons for GPF. In addition, the Defendants were responsible for managing GPF and reported to Gould executives located in New York. All of the accounting functions for GPF are performed out of Gould's executive offices in New York.

4.    At the time Gomez and Huempfner were first employed by Gould, all sales by the GPF division were what is known as "mill direct", i.e, all orders were shipped directly from the mill to the customer without Gould ever taking physical possession of the goods.

5.    Between October 1, 2003 and April 1, 2005, Gomez's commission rates were 40% unloaded on sales of web or roll paper and 30% unloaded on sales of sheet fed paper. Between April 1, 1999 and April 1, 2005, Huempfner's commission rate was 40% unloaded on all sales of paper both web and sheet fed.

6.    On or about November 1, 2002, Gomez and Huempfner told Gould that it would help their business if the GPF division had a warehouse where it could maintain inventory that would allow them to better service their customers by having paper available for immediate delivery. Accordingly, Gould agreed to rent a warehouse in Medley, FL. Sales made from Gould's warehouse were internally designated as "warehouse" or "indirect" sales.

7.    As of March 30, 2005, the GPF division had lost nearly $40,000 for the year, in part caused by the cost of maintaining the Medley warehouse.

8.    On April 1, 2005, I, together with Harry E. Gould, Jr., Gould's Chairman and Mike Duncan, President of Gould's National Division, under which the GPF division operated, met with Gomez and Huempfner in New York City to discuss changes in the operations of the GPF

-2-

division to make it profitable.   At the conclusion of the meeting it was agreed, among other

things, that henceforth both Gomez's and Huempfner's commission rates would be 40% unloaded

on mill direct sales and 30% unloaded on indirect or warehouse sales made from Gould's

warehouse in Medley.   The lower commission on warehouse sales was in recognition of the

additional costs incurred by Gould in carrying and warehousing the inventory.  As consideration

for their agreeing to lower their commission rates, Gould agreed to split the GPF division's 2005

profits in excess of $150,000 50% to Gould and 50% to Gomez and Huempfner, collectively.

     9.     Gomez and Huempfner both resigned from Gould on June 16, 2006, and went to

work for one of our competitors, the Anderson Paper Division of E. Aaron Enterprises, Inc.

("Aaron Enterprises").

     10.     Following Gomez's and Huempfner's resignations, it was discovered that after

April 1, 2005, numerous of their sales were classified for commission accounting purposes as

"mill direct" sales rather than as "warehouse" or "indirect" sales.  As a consequence, both

Defendants received substantial excess commissions.

     11.     In addition, after Defendants left Gould, there were a number of chargebacks to

their previously paid commissions as a result of unauthorized customer deductions, claims, failure

to pay, interest on overdue accounts and the like.[1]   In addition, we found evidence indicating that

Gomez may have referred orders by one of his customers, Carribean Forms Manufacturing, Inc.

("CFM") to Aaron Enterprises while he was still employed by Gould.

---

[1] Gould's salespersons are paid upon the issuance of an invoice to the customer and prior to the customer
actually paying.  A salesperson is "chargedback" if the actual amount received by Gould is less than the amount upon
which the original commission was calculated or if there are other charges such as interest on overdue accounts.

12.    By letters dated April 10, 2007, which are annexed hereto as Exhibit B, I asked that Defendants repay the amounts owed to Gould and even offered to negotiate a payment arrangement over time.  Defendants never responded to these letters, hence the necessity for this action.

### THE MOTION TO TRANSFER

13.    The convenience of the parties and witnesses clearly favors keeping this case in New York.  Including myself, there are nine Gould employees (all of whom are located in New York) who are potential witnesses.  I attended the meeting on April 1, 2005, with Defendants at which their new commission arrangements were agreed to.  I also sent a confirming email to them, a copy of which is annexed hereto as Exhibit C.  I also had numerous communications with Defendants over the years regarding GPF, its profitability, expenses and their commissions. In addition, as Executive Vice President and Chief Financial Officer of Gould, I have supervisory authority over GPF and am fully familiar with its business and financial condition.

14.    Other Gould employees who have relevant testimony are:

•    Harry E. Gould, Jr.  Mr. Gould is Gould's owner and Chief Executive Officer.  He was personally involved in the major decisions relating to the business of GPF and participated in the decision to change Defendants' commission arrangement.

•    Michael Duncan.  Mr. Duncan is President of the Gould National Division and was Defendants' immediate supervisor.  He attended the meting of April 1, 2005, and participated in the decision to change Defendants' commission arrangement.  Mr. Duncan is also knowledgeable about GPF's business and performance during the relevant period covered by the Complaint.

-4-

    • <u>Michael Ritter</u>.  Vice President of Credit Operations.  He can testify concerning credits and write-offs that comprise certain of the chargebacks to Defendants' commissions.

    • <u>Paul Collins</u>.  Vice President Logistics.  Mr. Collins was supervised the reconstruction of Defendants' sales and commissions after they left Gould's employ.  He has relevant testimony as to how Defendants mis-coded certain of their sales as mill direct rather than as warehouse sales in order to earn excess commissions.

    • <u>Robert Hartman</u>.  Controller.  His department is responsible for the calculation of Defendants' commissions and the generation of their commission statements.

    • <u>Constantin Dardic</u>.  Assistant Controller.  Participated in the reconstruction of the amounts due from Defendants as a result of their mis-coding of sales and other chargebacks.

    • <u>Frank Kinsella</u>.  Was the Customer Service Representative for Defendants during the relevant time period.  Mr. Kinsella was responsible for processing Defendants' orders in Gould's order processing system.

  15. It would not be unduly burdensome for Defendants to come to New York in connection with this matter as they frequently traveled here when they were employed by Gould.  Indeed, during 2005 alone, Defendants made at least two trips to New York during which they stayed at the Waldorf Astoria.

  16. Contrary to Defendants' contention, the convenience of third party witnesses would not be served by transfer of the case to Florida.  First, the issue of whether Defendants' sales were properly coded as mill direct or warehouse sales can be determined from Gould's

business records maintained on its computers in New York, not from testimony from the customers.

17.     Second, if the testimony of any Florida customer turns out to be relevant, they can be subpoenaed to appear in Miami or in whatever Florida district they are located.  Since Defendants and their lead counsel are located in Florida, there will be no inconvenience or extra expense to them for such depositions.  If there is any additional burden or expense in this regard, it will be Gould's.

18.     The only other potential third party witnesses of whom I am aware are Aaron Enterprises and CFM who could be called as witnesses in connection with Gould's second cause of action against Gomez for breach of fiduciary duty.  CFM is located in San Juan, P.R. and thus could not be compelled to appear in Florida.  As for Aaron Enterprises, as can be seen from the annexed Exhibit D, a print-out from the New York Stated Division of Corporations, it is a Pennsylvania corporation with its principal place of business in Plymouth Meeting, PA, a suburb of Philadelphia, and is qualified to do business in New York.  Thus, New York is a more convenient forum for this witness.

19.     Finally, the relevant documents and electronic data are all located at Gould's offices in New York.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, N.Y.
          September 14, 2007

                                        Carl Matthews

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - x
GOULD PAPER CORPORATION,

               Plaintiff,

        -against-

ALEX GOMEZ and JOHN HUEMPFNER,

               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - :



07 CIV 6087

COMPLAINT



JUN 2 8 2007

U.S.D.C. S.D. N.Y.
CASHIERS

      Plaintiff, Gould Paper Corporation, by its attorney, Jack Hassid, Esq., for its complaint, alleges:

## THE PARTIES

    1.    Plaintiff Gould Paper Corporation ("Gould") is a corporation organized and existing pursuant to the laws of the State of New York with its principal place of business at 11 Madison Avenue, New York, N.Y.

    2.    Upon information and belief, defendant Alex Gomez ("Gomez") is a citizen of the State of Florida, residing at 16360 Paddock Lane, Weston, FL 33326.

    3.    Upon information and belief, defendant John Huempfner ("Huempfner") is a citizen of the State of Florida, residing at 128 Victoria Lane, Jupiter, FL 33458.

## JURISDICTION AND VENUE

    4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(1) as this is an action between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) in that this is the

district in which a substantial part of the events or omissions giving rise to the claims asserted in

this action occurred.

## FACTUAL BACKGROUND

6.      Gould is what is known in the trade as a paper merchant.  It is engaged in the

business of selling various types of paper used in business, publishing and in the printing trades.

Gould services its customers in two ways: either arranging for paper to be shipped directly from

the mill to the customer; or from its own inventory.

7.      At all times relevant herein, Gould operated a separate division known as Gould

Paper Florida ("GPF") in order to service customers in Florida and the Carribean.

8.      At all times relevant herein, Gomez was a commission salesperson in the employ

of Gould at its GPF division until his resignation on June 16, 2006.

9.      At all times relevant herein, Huempfner was a commission salesperson in the

employ of Gould at its GPF division until his resignation on June 16, 2006.

10.      Upon information and belief, following their resignations, both Gomez and

Huempfner went to work for Anderson Paper, a division of E. Aaron Enterprises, Inc. ("Ander-

son Paper"), one of Gould's competitors.

11.      Commissions are calculated on the basis of "gross trading margin" ("GTM") and

may be either "loaded" or "unloaded".   The GTM is determined by subtracting the cost of paper

to Gould from the price paid by the customer.  By way of example, if the customer pays $10,000

for paper that cost Gould $9,000, the GTM is $1,000.  If the salesperson is at a 40% unloaded

commission rate, his commission will be $400 (40% x $1,000).      In a "loaded" commission

arrangement, an additional percentage "load" to compensate Gould for its overhead, is applied to the cost of goods before the salesperson's GTM is determined. By way of example, in the foregoing situation, if the salesperson's commission arrangement included a 1% load, an additional 1% or $90 would be deducted (1% x the $9,000 cost of goods) to determine the GTM. In this example, the GTM would be $910 and the commission at 40% would be $364.

12.    Between October 1, 2003 and April 1, 2005, Gomez's commission rates were 40% unloaded on sales of web or roll paper and 30% unloaded on sales of sheet fed paper.

13.    Between April 1, 1999 and April 1, 2005, Huempfner's commission rate was 40% unloaded on all sales of paper both web and sheet fed.

14.    At the time Gomez and Huempfner were first employed by Gould, all sales by the GPF division were what is known as "mill direct", i.e, all orders were shipped directly from the mill to the customer without Gould ever taking physical possession of the goods.

15.    On or about November 1, 2002, Gomez and Huempfner told Gould that it would help their business if the GPF division had a warehouse where it could maintain inventory that would allow them to better service their customers by having paper available for immediate delivery. Accordingly, Gould agreed to rent a warehouse in Medley, FL. Sales made from Gould's warehouse were internally designated as "warehouse" or "indirect" sales.

16.    As of March 30, 2005, the GPF division had lost nearly $40,000 for the year, in part caused by the cost of maintaining the Medley warehouse.

17.    On April 1, 2005, Harry E. Gould, Jr., Gould Chairman, Carl Matthews, Gould's Executive Vice President, and Mike Duncan, President of Gould's National Division, under which the GPF division operated, met with Gomez and Huempfner in New York City to discuss

-3-

changes in the operations of the GPF division to make it profitable.   At the conclusion of the

meeting it was agreed, among other things, that henceforth both Gomez's and Huempfner's

commission rates would be 40% unloaded on mill direct sales and 30% unloaded on indirect or

warehouse sales made from Gould's warehouse in Medley.  The lower commission on warehouse

sales was in recognition of the additional costs incurred by Gould in carrying and warehousing

the inventory.  As consideration for their agreeing to lower their commission rates, Gould agreed

to split the GPF division's 2005 profits above $150,000 50/50 with Gomez and Huempfner.

18.    At all times relevant herein, Gomez and Huempfner were subject to the terms of

Gould's Policy Manual for commission salespersons.  Among other things, the Policy Manual

provides for certain deductions or chargebacks which may be made against a salesperson's

commissions.  Section 3.1 of the Policy Manual governs policy credits which may be given to a

customer arising out of quality or other claims.  It provides, in pertinent part:

> When a claim is settled, the Complaint Department will forward
> the file to the Billing Department with written instructions regard-
> ing the amounts agreed upon between the customer, the company
> and the mill and a debit will be issued.  Upon receipt of a credit
> from the mill, a credit will be issued to the customer and the sales-
> person will share in any adjustment at his/her appropriate
> commission rate.
>
> If the customer and mill are not in agreement, that is, the customer
> wants more than the amount the mill offer, a policy credit may
> have to be issued.  In these circumstances, the salesperson will
> share in any loss at his/her appropriate commission rate.

19.    Section 4.3 of the Policy Manual provides as follows with respect to charge-

backs that may be made where the customer makes unauthorized deductions from Gould's

invoice:

-4-

Accounts Receivable chargebacks are issued to account for discrepancies when a customer pays an amount which disagrees with our invoice.

Examples are when a customer deducts for a price difference, extra freight charges, does not pay sales tax, takes a 2% discount when 1% was allowed, takes a discount after the due date, paper claims, etc.

A copy of the chargeback is sent to the salesperson for his/her use in resolving the deduction. If it has not been resolved after 60 days from the date of the chargeback, it will be written off and the salesperson will share at his/her appropriate commission rate. . . .

If, subsequently, the customer pays back the deduction, the salesperson's commission will be reimbursed at his/her appropriate commission rate.

20.    Section 4.4 of the Policy Manual provides as follows with respect to interest charges on overdue accounts receivable:

Due to the cost of financing, an interest charge on all customer's accounts receivables 60 days and over will be charged against the salesperson at his/her appropriate commission rate. The interest rate will be Gould's effective interest rate for that month.

### FIRST CLAIM FOR RELIEF
### (Against Gomez)

21.    Gould repeats and realleges each and every allegation hereinabove set forth in Paragraphs 1 through 20.

22.    Following Gomez's resignation from Gould, it was discovered that after April 1, 2005, numerous of his sales were improperly classified as "mill direct" sales rather than as "warehouse" or "indirect" sales. As a result of this misclassification, Gomez received excess commissions of $37,901, prior to his resignation from Gould.

-5-

23.    Between June, 2006 and March, 2007, Gomez's commissions were charged back a total of $35,722.82, on account of credits and deductions on sales on which he received full commissions prior to his resignation from Gould.  This is net of commissions of $1,428, that Gomez earned in November, 2006 and which have been credited to him.

24.    Between June, 2006 and February, 2007, there were interest charges on overdue accounts receivable totaling $11,056.13, with respect to sales on which Gomez received full commissions prior to his resignation from Gould.

25.    Between June, 2006 and February, 2007, there were bad debt and policy write-offs totaling $5,265.52, with respect to sales on which Gomez received full commissions prior to his resignation from Gould.

26.    By letter dated April 10, 2007, Gould demanded that Gomez repay the sum of $89,445.17, representing the amounts owed by him to Gould as set forth in Paragraphs 22-25 above, less $500 owed to Gomez by Gould for certain travel expenses.

27.    Gomez,  in breach of the terms of his employment, has failed and refused to repay the aforesaid amounts owed to Gould

28.    As a consequence of the foregoing, Gould has been damaged in the amount of $89,445.17.

## SECOND CLAIM FOR RELIEF
### (Against Gomez)

29.    Gould repeats and realleges each and every allegation hereinabove set forth in Paragraphs 1 through 20 herein.

30.    At all times while he was employed by Gould, Gomez owed a fiduciary duty to it to act only in the best interests of Gould.

-6-

31.    While he was employed by Gould, one of Gomez's customers was Caribbean Forms Manufacturing, Inc. ("CFM"), located in San Juan, P.R.

32.    Upon information and belief, in or about May, 2006, while he was employed by Gould, Gomez diverted orders totaling $115,635 from CFM to Anderson Paper, his prospective new employer.

33.    As a consequence of the foregoing, Gould has been damaged in the amount of $9,666.

### THIRD CLAIM FOR RELIEF
#### (Against Huempfner)

34.    Gould repeats and realleges each and every allegation hereinabove set forth in Paragraphs 1 through 20.

35.    Following Huempfner's resignation from Gould, it was discovered that after April 1, 2005, numerous of his sales were improperly classified as "mill direct" sales rather than as "warehouse" or "indirect" sales. As a result of this misclassification, Huempfner received excess commissions of $23,912, prior to his resignation from Gould.

36.    Between June, 2006 and February, 2007, Huempfner's commissions were charged back a total of $49,535.12, on account of credits and deductions on sales on which he received full commissions prior to his resignation from Gould. This is net of commissions of $3,284.23, that Huempfner earned in June, 2006, and which have been credited to him.

37.    Between June, 2006 and February, 2007, there were interest charges on overdue accounts receivable totaling $16,146.01, with respect to sales on which Huempfner received full commissions prior to his resignation from Gould.

-7-

38.    Between June, 2006 and February, 2007, there were bad debt and policy write-offs totaling $23,395.09, with respect to sales on which Huempfner received full commissions prior to his resignation from Gould.

39.    By letter dated April 10, 2007, Gould demanded that Huempfner repay the sum of $112,714.62, representing the amounts owed by him to Gould as set forth in Paragraphs 35-38 above, less $273.60, owed to Huempfner by Gould for certain expenses.

40.    Huempfner, in breach of the terms of his employment, has failed and refused to repay the aforesaid amounts owed to Gould

41.    As a consequence of the foregoing, Gould has been damaged in the amount of $112,714.62.

WHEREFORE, plaintiff demands judgment as follows:

A.    On the first cause of action, against Gomez in the amount of $89,445.17, with interest from June 16, 2006.

B.    On the second cause of action, against Gomez in the amount of $9,666, with interest from May 1, 2006.

C.    On the third cause of action, against Huempfner in the amount of $112,714.62, with interest from June 16, 2006.

D.    The costs and disbursements of this action.

E.    Such other and further relief as to the Court may seem just and proper.

Dated: New York, N.Y.
        June 21, 2007

-8-

JACK HASSID, ESQ.

_____

Jack Hassid, Esq. (JH8073)
Attorney for Plaintiff
460 Park Avenue - 10th Floor
New York, N.Y. 10022
(212) 421-4932

**EXHIBIT B**

# GOULD
PAPER CORPORATION

CARL J. MATTHEWS
EXECUTIVE VP & CFO

April 10, 2007

**VIA FEDERAL EXPRESS**

Mr. Alex Gomez
Anderson Paper
6710 Main Street, Ste. 236
Miami Lakes, FL 33014

Dear Alex:

Since you left Gould last June, a number of issues have arisen with respect to commissions that were paid to you while your were in our employ. As you know, under the terms of our deal, you were paid full commissions upon invoicing subject to adjustment for any credits issued to or deductions taken by the customer. In addition, your commissions were subject to further adjustment for interest charges incurred on accounts receivable over 60 days old as well as any bad debts that had to be written off.

Between June, 2006 and March, 2007, your commissions were charged back a total of $35,722.82, on account of credits and deductions on sales on which you received full commissions. (This is net of commissions of $1,428, that you earned in November, 2006 and which have been credited to you.)

Between June, 2006 and February, 2007, there were interest charges on overdue accounts receivable totaling $11,056.13, with respect to sales on which you received full commissions.



**GOULD**
PAPER CORPORATION

Mr. Alex Gomez
April 10, 2007
Page 2

Between June, 2006 and February, 2007, there were bad debt and policy write-offs totaling $5,265.52, with respect to sales on which you received full commissions.

Another issue relates to the commission rates on direct vs. indirect sales. At a meeting we had on April 1, 2005, it was agreed that going forward commissions on direct sales would be 40% unloaded and on indirect, warehouse sales, 30% unloaded. This understanding was memorialized in my e-mail to you of April 5, 2005, a copy of which is enclosed. It appears that subsequent to April 1, 2005, numerous of your sales were improperly classified as "direct" when they were in fact, "indirect". As a consequence, you received excess commissions of $37,901.

We owe you a credit of $500 for expenses.

Thus, on the basis of the foregoing, it appears that you owe Gould a total of $89,445.47, for excess commissions that were paid to you.

All of the documentation supporting the foregoing charges is available and can be sent to you if you need to see the backup.

I also need to advise you that we have had to commence an action against one of your customers, A-Plus Printing and Graphics Center, Inc., in order to recover unpaid receivables totaling $463,843.51, on which you earned and were paid commissions of $11,683.49. If we are unable to recover the full amount due from A-Plus your commissions will be adjusted accordingly.

In addition, there are two issues relating to monies owed to Gould by E. Aaron Enterprises, Inc. d/b/a Anderson Converting. First, it was agreed that Gould would receive a commission on the converting job for Case Paper Co., Inc. that it referred to Anderson Converting. This commission is $5,757.24, which we have never been paid. Second, that a Case Paper check



**GOULD**
PAPER CORPORATION

Mr. Alex Gomez
April 10, 2007
Page 3

dated September 11, 2006, in the amount of $1,686.96, payable to Alliance
Converting LLC, was deposited into Anderson Converting's account. These
funds need to be repaid to us.

     I would appreciate it if you would call me at your earliest convenience
so that we may discuss this in the expectation that we can resolve this matter
on an amicable and professional basis. With respect to the commissions
owed, we would be willing to consider repayment over a reasonable period of
time. If we are unable to come to an agreement we will pursue all available
legal remedies. I look forward to hearing from you.

                                        Very truly yours,

                                        Carl Matthews

Encl.



PAPER CORPORATION

CARL J. MATTHEWS
EXECUTIVE VP & CFO

April 10, 2007

**VIA FEDERAL EXPRESS**

Mr. John Huempfner
Anderson Paper
6710 Main Street, Ste. 236
Miami Lakes, FL 33014

Dear John:

Since you left Gould last June, a number of issues have arisen with
respect to commissions that were paid to you while your were in our employ.
As you know, under the terms of our deal, you were paid full commissions
upon invoicing subject to adjustment for any credits issued to or deductions
taken by the customer. In addition, your commissions were subject to further
adjustment for interest charges incurred on accounts receivable over 60 days
old, storage charged on inventory more than 90 days old, as well as any bad
debts that had to be written off.

Between June and February, 2007, your commissions were charged
back a total of $49,535.12, on account of credits and deductions on sales on
which you received full commissions. (This is net of commissions of
$3,284.23, that you earned in June, 2006 and which have been credited to
you.)

Between June, 2006 and February, 2007, there were interest charges on
overdue accounts receivable totaling $16,146.01, with respect to sales on
which you received full commissions.



Mr. John Huempfner
April 10, 2007
Page 2


Between June, 2006 and February, 2007, there were bad debt and policy write-offs totaling $23,395.09, with respect to sales on which you received full commissions.

Another issue relates to the commission rates on direct vs. indirect sales. At a meeting we had on April 1, 2005, it was agreed that going forward commissions on direct sales would be 40% unloaded and on indirect, warehouse sales, 30% unloaded. This understanding was memorialized in my e-mail to you of April 5, 2005, a copy of which is enclosed. It appears that subsequent to April 1, 2005, numerous of your sales were improperly classified as "direct" when they were in fact, "indirect". As a consequence, you received excess commissions of $23,912.

We owe you a credit of $273.60, for expenses.

Thus, on the basis of the foregoing, it appears that you owe Gould a total of $112,714.62, for excess commissions that were paid to you.

All of the documentation supporting the foregoing charges is available and can be sent to you if you need to see the backup.

In addition, there are two issues relating to monies owed to Gould by E. Aaron Enterprises, Inc. d/b/a Anderson Converting. First, it was agreed that Gould would receive a commission on the converting job for Case Paper Co., Inc. that it referred to Anderson Converting. This commission is $5,757.24, which we have never been paid. Second, that a Case Paper check dated September 11, 2006, in the amount of $1,686.96, payable to Alliance Converting LLC, was deposited into Anderson Converting's account. These funds need to be repaid to us.

I would appreciate it if you would call me at your earliest convenience so that we may discuss this in the expectation that we can resolve this matter on an amicable and professional basis. With respect to the commissions


PAPER CORPORATION

Mr. John Huempfner
April 10, 2007
Page 3

owed, we would be willing to consider repayment over a reasonable period of time. If we are unable to come to an agreement we will pursue all available legal remedies. I look forward to hearing from you.

Very truly yours,

Carl Matthews

Encl.

**EXHIBIT C**



Carl
Matthews/GOULD_PAPER_C
ORPORATION

04/05/2005 05:04 PM

To  John
Huempfner/GOULD_PAPER_CORPORATION@GOULD_PA
PER_CORPORATION, Alex
cc  HEG/GOULD_PAPER_CORPORATION@GOULD_PAPER_
CORPORATION, Mike
Duncan/GOULD_PAPER_CORPORATION@GOULD_PAPE
bcc

Subject  GPF - Changes

John / Alex,

As a follow-up to our meeting on Friday, April 1, the following changes will be instituted:

1.      The GTM expectations for 2005 will, overall, be the same as 2004 or 11%

2.      Expense reductions that you outlined will occur as follows:

| | |
|---|---|
| Interest Expense | $  89K |
| Bad Debt Expense | 40 |
| Truck Repairs | 4 |
| Overtime reduction | 16 |
| | $149K |

3.      The charge from Alliance to Gould will be reduced by $1.00 / cwt.  The impact of this change will be to increase the GPF GTM by $68K / yr.  There would be no commissions paid on this $68K.

4.      The commission structure will be as follows:

| | |
|---|---|
| Direct | 40% Unloaded |
| Warehouse | 30% Unloaded |

5.      For commission purposes, the definition of warehouse business is any paper that enters the warehouse regardless of the time on the floor

6.      In exchange for the commission reduction, Gould will split the 2005 profit above $150K on a 50 / 50 basis, i.e., 50% Gould -- 50% Huempfner / Gomez.  The profit participation is only for the year 2005.

The impact of these changes on GPF could result in the following:

| | |
|---|---|
| Operating Profit 2004 (Assumes 11% GTM) | $  54 |
| Expense Savings | 149 |
| Alliance Charge to GPF (Reduced by $1 / cwt) | 68 |
| Commission Savings (Warehouse to 30% Unloaded) | 112 |
| | 383 |
| | 150 |
| | $233 / 2 = $116 |



31459.pdf

**EXHIBIT D**

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: E. AARON ENTERPRISES, INC.

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | E. AARON ENTERPRISES, INC. |
| **Initial DOS Filing Date:** | JANUARY 11, 2000 |
| **County:** | NEW YORK |
| **Jurisdiction:** | PENNSYLVANIA |
| **Entity Type:** | FOREIGN BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

E. AARON ENTERPRISES, INC.
630 W GERMANTOWN PIKE
SUITE 385
PLYMOUTH MEETING, PENNSYLVANIA, 19462

**Chairman or Chief Executive Officer**

EUGENE AARON
630 W GERMANTOWN PIKE
SUITE 385
PLYMOUTH MEETING, PENNSYLVANIA, 19462

**Principal Executive Office**

E. AARON ENTERPRISES, INC.
630 W GERMANTOWN PIKE
SUITE 385
PLYMOUTH MEETING, PENNSYLVANIA, 19462

**Registered Agent**

NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page