UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
GOULD PAPER CORPORATION,

        Plaintiff,                         07 CIV. 6087 (DC)

                                        ECF CASE

       -against-                     AMENDED COMPLAINT

MADISEN CORP. and AMRON PAPER, INC.

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiff, Gould Paper Corporation, by its attorney, Jack Hassid, Esq., for its amended complaint, alleges:

## THE PARTIES

      1.      Plaintiff Gould Paper Corporation ("Gould") is a corporation organized and existing pursuant to the laws of the State of New York with its principal place of business at 11 Madison Avenue, New York, N.Y.

      2.      Upon information and belief, defendant Madisen Corp. ("Madisen") is a corporation organized and existing pursuant to the laws of the State of Florida, with its principal place of business at 16360 Paddock Lane, Weston, FL 33326.

      3.      Upon information and belief, defendant Amron Paper, Inc. ("Amron") is a corporation organized and existing pursuant to the laws of the State of Florida, with its principal place of business at 128 Victorian Lane, Jupiter, FL 33458.

## JURISDICTION AND VENUE

4.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(1) as this is an action between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) in that this is the district in which a substantial part of the events or omissions giving rise to the claims asserted in this action occurred.

## FACTUAL BACKGROUND

6.  Gould is what is known in the trade as a paper merchant. It is engaged in the business of selling various types of paper used in business, publishing and in the printing trades. Gould services its customers in two ways: either arranging for paper to be shipped directly from the mill to the customer; or from its own inventory.

7.  At all times relevant herein, Gould operated a separate division known as Gould Paper Florida ("GPF") in order to service customers in Florida and the Carribean.

8.  At all times relevant herein, Alex Gomez ("Gomez") was a commission salesperson in the employ of Gould at its GPF division until his resignation on June 16, 2006. Upon information and belief, Gomez is the sole officer, director and shareholder of Madisen. Madisen was created by Gomez as the entity to which he directed his sales commissions to be paid by Gould in order to obtain certain tax benefits.

9.  At all times relevant herein, John Huempfner ("Huempfner") was a commission salesperson in the employ of Gould at its GPF division until his resignation on June 16, 2006. Upon information and belief, Huempfner is the sole officer, director and shareholder of Amron.

Amron was created by Huempfner as the entity to which he directed his sales commissions to be paid by Gould in order to obtain certain tax benefits.

10. At all times relevant herein, Gomez and Huempfner were responsible for managing the day to day operations and business of GPF.

11. Commissions are calculated on the basis of "gross trading margin" ("GTM") and may be either "loaded" or "unloaded". The GTM is determined by subtracting the cost of paper to Gould from the price paid by the customer. By way of example, if the customer pays $10,000 for paper that cost Gould $9,000, the GTM is $1,000. If the salesperson is at a 40% unloaded commission rate, his commission will be $400 (40% x $1,000). In a "loaded" commission arrangement, an additional percentage "load" to compensate Gould for its overhead, is applied to the cost of goods before the salesperson's GTM is determined. By way of example, in the foregoing situation, if the salesperson's commission arrangement included a 1% load, an additional 1% or $90 would be deducted (1% x the $9,000 cost of goods) to determine the GTM. In this example, the GTM would be $910 and the commission at 40% would be $364.

12. Between October 1, 2003 and April 1, 2005, Gomez's commission rates were 40% unloaded on sales of web or roll paper and 30% unloaded on sales of sheet fed paper.

13. Between April 1, 1999 and April 1, 2005, Huempfner's commission rate was 40% unloaded on all sales of paper both web and sheet fed.

14. At the time Gomez and Huempfner were first employed by Gould, all sales by the GPF division were what is known as "mill direct", i.e, all orders were shipped directly from the mill to the customer without Gould ever taking physical possession of the goods.

15. On or about November 1, 2002, Gomez and Huempfner told Gould that it would help their business if the GPF division had a warehouse where it could maintain inventory that would allow them to better service their customers by having paper available for immediate delivery. Accordingly, Gould agreed to rent a warehouse in Medley, FL. Sales made from Gould's warehouse were internally designated as "warehouse" or "indirect" sales.

16. As of March 30, 2005, the GPF division had lost nearly $40,000 for the year, in part caused by the cost of maintaining the Medley warehouse.

17. On April 1, 2005, Harry E. Gould, Jr., Gould's Chairman, Carl Matthews, Gould's Executive Vice President, and Mike Duncan, President of Gould's National Division, under which the GPF division operated, met with Gomez and Huempfner in New York City to discuss changes in the operations of the GPF division to make it profitable. At the conclusion of the meeting it was agreed, among other things, that henceforth both Gomez's and Huempfner's commission rates would be 40% unloaded on mill direct sales and 30% unloaded on indirect or warehouse sales made from Gould's warehouse in Medley. The lower commission on warehouse sales was in recognition of the additional costs incurred by Gould in carrying and warehousing the inventory. As consideration for their agreeing to lower their commission rates, Gould agreed to split the GPF division's 2005 profits in excess of $150,000, 50 % to Gould and 50% to Gomez and Huempfner, collectively.

18. At all times relevant herein, Gomez and Huempfner and, in turn, their personal corporations, Madisen and Amron, were subject to the terms of Gould's Policy Manual for commission salespersons. Among other things, the Policy Manual provides for certain deductions or chargebacks which may be made against a salesperson's commissions. Section 3.1 of the

Policy Manual governs policy credits which may be given to a customer arising out of quality or other claims. It provides, in pertinent part:

> When a claim is settled, the Complaint Department will forward the file to the Billing Department with written instructions regarding the amounts agreed upon between the customer, the company and the mill and a debit will be issued. Upon receipt of a credit from the mill, a credit will be issued to the customer and the salesperson will share in any adjustment at his/her appropriate commission rate.
>
> If the customer and mill are not in agreement, that is, the customer wants more than the amount [of] the mill offer, a policy credit may have to be issued. In these circumstances, the salesperson will share in any loss at his/her appropriate commission rate.

19. Section 4.3 of the Policy Manual provides as follows with respect to chargebacks that may be made where the customer makes unauthorized deductions from Gould's invoice:

> Accounts Receivable chargebacks are issued to account for discrepancies when a customer pays an amount which disagrees with our invoice.
>
> Examples are when a customer deducts for a price difference, extra freight charges, does not pay sales tax, takes a 2% discount when 1% was allowed, takes a discount after the due date, paper claims, etc.
>
> A copy of the chargeback is sent to the salesperson for his/her use in resolving the deduction. If it has not been resolved after 60 days from the date of the chargeback, it will be written off and the salesperson will share at his/her appropriate commission rate. . . .
>
> If, subsequently, the customer pays back the deduction, the salesperson's commission will be reimbursed at his/her appropriate commission rate.

20. Section 4.4 of the Policy Manual provides as follows with respect to interest charges on overdue accounts receivable:

> Due to the cost of financing, an interest charge on all customer's accounts receivables 60 days and over will be charged against the salesperson at his/her appropriate commission rate. The interest rate will be Gould's effective interest rate for that month.

**FIRST CLAIM FOR RELIEF**
**(Against Madisen)**

21.     Gould repeats and realleges each and every allegation hereinabove set forth in Paragraphs 1 through 20.

22.     Following Gomez's resignation from Gould, it was discovered that after April 1, 2005, many of his sales transactions were improperly classified as "mill direct" sales rather than as "warehouse" or "indirect" sales. As a result of this misclassification, Gomez, through Madisen, received excess commissions of $37,901, prior to Gomez's resignation from Gould.

23.     Between June, 2006 and March, 2007, Gomez's commissions were charged back a total of $37,835.19, on account of credits and deductions on sales on which he received full commissions prior to his resignation from Gould. This is net of commissions of $1,428, that Gomez earned in November, 2006 and which have been credited to him.

24.     Between June, 2006 and February, 2007, there were interest charges on overdue accounts receivable totaling $11,056.13, with respect to sales on which Gomez through Madisen received full commissions prior to his resignation from Gould.

25.     Between June, 2006 and February, 2007, there were bad debt and policy write-offs totaling $5,265.52, with respect to sales on which Gomez through Madisen received full commissions prior to his resignation from Gould.

26. By letter dated April 10, 2007, Gould demanded that Gomez repay the amounts owed to Gould as set forth in Paragraphs 23-25 above, less $500 owed to Gomez by Gould for certain travel expenses.

27. Madisen, in breach of the terms of Gomez's employment, has failed and refused to repay the aforesaid amounts owed to Gould

28. As a consequence of the foregoing, Gould has been damaged in the amount of $91,557.54

## SECOND CLAIM FOR RELIEF
### (Against Amron)

29. Gould repeats and realleges each and every allegation hereinabove set forth in Paragraphs 1 through 20.

30. Following Huempfner's resignation from Gould, it was discovered that after April 1, 2005, many of his sales transactions were improperly classified as "mill direct" sales rather than as "warehouse" or "indirect" sales. As a result of this misclassification, Huempfner, through Amron, received excess commissions of $23,912, prior to his resignation from Gould.

31. Between June, 2006 and February, 2007, Huempfner's commissions were charged back a total of $49,535.12, on account of credits and deductions on sales on which he received full commissions prior to his resignation from Gould. This is net of commissions of $3,284.23, that Huempfner earned in June, 2006, and which have been credited to him.

32. Between June, 2006 and February, 2007, there were interest charges on overdue accounts receivable totaling $16,146.01, with respect to sales on which Huempfner received full commissions prior to his resignation from Gould.

33. Between June, 2006 and February, 2007, there were bad debt and policy write-offs totaling $23,395.09, with respect to sales on which Huempfner received full commissions prior to his resignation from Gould.

34. By letter dated April 10, 2007, Gould demanded that Huempfner repay the sum of $112,714.62, representing the amounts owed by him to Gould as set forth in Paragraphs 30-33 above, less $273.60, owed to Huempfner by Gould for certain expenses.

35. Amron, in breach of the terms of Huempfner's employment, has failed and refused to repay the aforesaid amounts owed to Gould

36. As a consequence of the foregoing, Gould has been damaged in the amount of $112,714.62.

WHEREFORE, plaintiff demands judgment as follows:

A. On the first cause of action, against Madisen in the amount of $91,557.54, with interest from June 16, 2006.

B. On the second cause of action, against Amron in the amount of $112,714.62, with interest from June 16, 2006.

C. The costs and disbursements of this action.

D. Such other and further relief as to the Court may seem just and proper.

Dated: New York, N.Y.
       February 11, 2008

                                        JACK HASSID, ESQ.

                                        /s/ Jack Hassid, Esq.
                                        Jack Hassid, Esq. (JH8073)
                                        Attorney for Plaintiff
                                        460 Park Avenue - 10th Floor
                                        New York, N.Y. 10022
                                        (212) 421-4932

TO:

SLIVERBERG & WEISS, P.A.
Attorneys for Defendants
2665 Executive Park Drive, Ste. 2
Weston, FL 33331

ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
Attorneys for Defendants
100 Lafayette Street, Ste. 501
New York, N.Y. 10013