## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

GOULD PAPER CORPORATION,

           Plaintiff,

v.

MADISEN CORP. and AMRON PAPER, INC.

           Defendants.

_____/

CASE NO. 07 CIV 6087
JUDGE CHIN

**ANSWER WITH AFFIRMATIVE**
**DEFENSES AND COUNTERCLAIM**

The Defendants, Madisen Corp. ("Madisen") and Amron Paper, Inc. ("Amron") (collectively, the "Defendants"), by and through their undersigned counsel and file this, their Answer to Amended Complaint with Affirmative Defenses and a Counterclaim and does state:

## ANSWER

1.      The Defendants admit the allegations in paragraph 1 of the Amended Complaint.

2.      The Defendants admit the allegations in paragraph 2 of the Amended Complaint.

3.      The Defendants admit the allegations in paragraph 3 of the Amended Complaint.

4.      The Defendants admit the allegations in paragraph 4 of the Amended Complaint.

5.      The Defendants admit the allegations in paragraph 5 of the Amended Complaint.

6.      The Defendants admit the allegations in paragraph 6, only to the extent that Gould is a paper merchant in the business of selling paper used in business, publishing and printing trades. The balance of the allegations in paragraph 6 are denied and the Defendants demand strict proof thereof.

7.      The Defendants admit the allegations in paragraph 7 of the Amended Complaint.

8.      The Defendants admit the allegations in paragraph 8 only to the extent that Alex Gomez is the sole officer, director, and shareholder of Madisen. The balance of the allegations in paragraph 8 are denied and the Defendants demand strict proof thereof.

9.      The Defendants admit the allegations in paragraph 9 only to the extent that John Huempfner is the sole officer, director, and shareholder of Amron.  The balance of the allegations in paragraph 9 are denied and the Defendants demand strict proof thereof.

10.      The Defendants deny the  allegations in paragraph 10 of the Amended Complaint and the Defendants demand strict proof thereof.

11.      The Defendants deny the  allegations in paragraph 11 of the Amended Complaint and the Defendants demand strict proof thereof.

12.      The Defendants deny the  allegations in paragraph 12 of the Amended Complaint and the Defendants demand strict proof thereof.

13.      The Defendants deny the  allegations in paragraph 13 of the Amended Complaint to the extent as it classifies the commission rate as solely "unloaded", and the Defendants demand strict proof thereof.

14.      The Defendants deny the  allegations in paragraph 14 of the Amended Complaint and the Defendants demand strict proof thereof.

15.      The Defendants deny the  allegations as stated in paragraph 15 of the Amended Complaint and the Defendants demand strict proof thereof.

16,      The Defendants are without knowledge of the allegations in paragraph 16 of the Amended Complaint and, therefore, demand strict proof thereof.

17.      The Defendants deny the  allegations in paragraph 17 as stated of the Amended Complaint and the Defendants demand strict proof thereof.

18.      The Defendants admit the allegations in paragraph 18 only to the extent that they received a Gould Policy Manuel while acting as independent salespersons for Gould.  The balance of the allegations in paragraph 18 are denied, and the Defendants demand strict proof thereof.

19.    The Defendants admit the allegation in paragraph 19, only to the extent that the document speaks for itself.

20.    The Defendants admit the allegation in paragraph 20, only to the extent that the document speaks for itself.

21.    The Defendants deny the  allegations in paragraph 21 of the Amended Complaint and the Defendants demand strict proof thereof.

22.    The Defendants deny the  allegations in paragraph 22 of the Amended Complaint and the Defendants demand strict proof thereof.

23.    The Defendants deny the  allegations in paragraph 23 of the Amended Complaint and the Defendants demand strict proof thereof.

24.    The Defendants deny the  allegations in paragraph 24 of the Amended Complaint and the Defendants demand strict proof thereof.

25.    The Defendants deny the  allegations in paragraph 25 of the Amended Complaint and the Defendants demand strict proof thereof.

26.    The Defendants deny the  allegations in paragraph 26 of the Amended Complaint and the Defendants demand strict proof thereof.

27.    The Defendants deny the  allegations in paragraph 27 of the Amended Complaint and the Defendants demand strict proof thereof.

28.    The Defendants deny the  allegations in paragraph 28 of the Amended Complaint and the Defendants demand strict proof thereof.

29.    The Defendants deny the  allegations in paragraph 29 of the Amended Complaint and the Defendants demand strict proof thereof.

30.    The Defendants deny the  allegations in paragraph 30 of the Amended Complaint and the Defendants demand strict proof thereof.

31.    The Defendants deny the allegations in paragraph 31 of the Amended Complaint and the Defendants demand strict proof thereof.

32.    The Defendants deny the allegations in paragraph 32 of the Amended Complaint and the Defendants demand strict proof thereof.

33.    The Defendants deny the allegations in paragraph 33 of the Amended Complaint and the Defendants demand strict proof thereof.

34.    The Defendants deny the allegations in paragraph 34 of the Amended Complaint and the Defendants demand strict proof thereof.

35.    The Defendants deny the allegations in paragraph 35 of the Amended Complaint and the Defendants demand strict proof thereof.

36.    The Defendants deny the allegations in paragraph 36 of the Amended Complaint and the Defendants demand strict proof thereof.

All allegations not specifically admitted or denied herein are deemed denied, and the Defendants demand strict proof thereof.

## **AFFIRMATIVE DEFENSES**

37.    As a first and singular affirmative defense, the Defendants assert the Doctrine of Estoppel, inasmuch as the Plaintiff's own policy manual dictates that subsequent sales persons, other than the Defendants, are responsible for any alleged balances claimed by Gould.  In addition, Gould's own pattern of improper behavior whereby it, *inter alia*,  (1) improperly deducted sums from the commissions otherwise owed to the Defendants; and (2) failed to reimburse the Defendants for subsequent customer payments, interest and commissions, which were previously charged back to the Defendants and deducted from commissions in violation of Gould's own policy; and (3) acted in concert with its own subsidiaries in a systematic effort to

"mark up" the price of the products sold by the Defendants in order to reduce the commissions otherwise owed to the Defendants, estopps Gould from seeking relief.

38.     As a second and singular affirmative defense, the Defendants assert the Doctrine of Waiver inasmuch as the Plaintiff's own policy manual dictates that subsequent sales persons, other than the Defendants, are responsible for any alleged balances claimed by Gould.   In addition, Gould's has waived any rights to collect said funds from the Defendants via its own pattern of improper behavior whereby it, *inter alia*,   (1) improperly deducted sums from the commissions otherwise owed to the Defendants; and (2) failed to reimburse the Defendants for subsequent customer payments, interest and commissions, which were previously charged back to the Defendants and deducted from commissions in violation of Gould's own policy; and (3) acted in concert with its own subsidiaries in a systematic effort to "mark up" the price of the products sold by the Defendants in order to reduce the commissions otherwise owed to the Defendants.

39.     As a third and singular affirmative defense, the Defendants assert the Defense of Accord and Satisfaction as to any amounts alleged due to the Plaintiff by the Defendants inasmuch as the Plaintiff's own policy manual dictates that subsequent sales persons, other than the Defendants, are responsible for any alleged balances claimed by Gould.

40.     As a fourth and singular affirmative defense, the Defendants assert the Defense of Setoff as to any amount alleged due to Plaintiff by the Defendants inasmuch as the Plaintiff owes the Defendant for its actions, inactions and violation of its own policy manual.

WHEREFORE, having answered the Complaint and raised valid affirmative defenses, the Defendants pray for an order dismissing Plaintiff's Amended Complaint with prejudice, as well as an award of fees, costs, and other such relief as this Court deems right and just.

## COUNTERCLAIM

The Defendants/Counter-Plaintiffs, Madisen Corp. ("Madisen") and Amron Paper, Inc. ("Amron"), hereby sues the Plaintiff/Counter-Defendant Gould Paper Corporation ("Gould") and does state:

## General Allegations

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as this is a diversity action between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 in that this is the district of which a substantial portion of the events giving rise to the claims asserted in this action occur.

3.    Madisen is a corporation duly organized and existing pursuant to the laws of the State of Florida.

4.    Amron is a corporation duly organized and existing pursuant to the laws of the State of Florida.

5.    Upon information and belief, Plaintiff, Gould is a corporation organized and existing pursuant to the laws of the State of New York.

## Factual Background

6.    The Counter-Defendant Gould is engaged in the business of selling various types of paper used in business, publishing and printing trades.

7.    At all times relevant herein, Madisen was a commissioned salesperson and independent contractor associated with Gould in the State of Florida.

8.    At all times relevant herein, Amron was a commissioned salesperson and independent contractor of Gould at its Florida location.

9.     Prior to April 1, 2005, both Madisen and Amron were under 40% sales commissions for all sales.

10.     On or about April 1, 2005, both Madisen and Amron entered into an oral agreement with Gould for the payment of sales commissions in the following manner:

　　　　a.  Both Madisen and Amron would be paid 40% of all direct or indirect sales; and

　　　　b.  Both Madisen and Amron would be paid 30% of all warehouse sales regardless of location.

11.     In the paper business, direct or indirect sales are sales which are specifically ordered for a customer and directed to a customer, whereas warehouse sales are sales out of existing inventory and whereby delivery is made out of said inventory (not initially ordered for a specific customer order).  The lower commission of the warehouse sales is in recognition of the additional risk and costs in the carrying and warehousing the inventory.

12.     During the ongoing business relationship in the Florida region between the parties, on or about April 1, 2005, both Madisen and Amron, as independent sales representatives of Gould, were presented with a Gould Policy Manual (the "Policy Manual").  The Policy Manual codifies Gould's policies with regard to the payment and retention of various sales commissions for its independent salespersons.

13.     In addition to their oral agreement, the Policy Manual also governs how certain situations with regard to commissions should be handled.  It provides in pertinent part, in Policy 1.3:

>     Whenever a salesperson leaves the company and the account is transferred to another salesperson, the company will be made whole regarding any outstanding claims, chargebacks, receivables, etc. before the new salesperson receives any commission.  For example, if there is a chargeback for $500 and it is a price

deduction, the company will deduct from the total gross profit of sales of the transferred account until the $500 is reached. The new salesperson will then receive commission on all subsequent sales.

In addition, Policy 4.1 states in pertinent part:

Sales personnel will be charged back for the commission paid to them on all unpaid invoices on any uncollectible accounts receivables. If subsequent collection is made on the "chargeback" invoices, the salesperson will receive a commission at his/her appropriate rate on the amount received in excess of all paper costs on all unpaid invoices, plus collection, legal fees and other related costs.

In addition, Rule 4.3 of the Policy Manual states in pertinent part:

Accounts receivable chargeback are issued to account for discrepancies when a customer pays an amount which disagrees with our invoice … if it has not been resolved after 60 days from the date of the chargeback, it will be written off and the salesperson will share at his/her appropriate commission rates … if, subsequently, the customer pays back the deduction, the salesperson's commission will be reimbursed at his/her appropriate commission rate.

14.    The Counter-Plaintiffs became disassociated from Gould in or about June 2006. Subsequent to this disassociation, both Madisen and Amron discovered a pattern of activity by Gould which was designed by Gould to improperly reduce, and deduct from, the commissions paid to Madisen and Amron. These activities include, but are not limited to:

a.    Failure to reimburse Madisen and Amron for any and all subsequent customer payments on amounts which were previously chargedback and deducted from the Counter-Plaintiffs' commissions pursuant to Rule 4.3 of the Policy Manual;

b.    Failure to reimburse Madisen and Amron for any and all interest which was deducted from the Counter-Plaintiffs' commission after chargeback and subsequent customer payment pursuant to Rule 4.1 and Rule 4.3 of the Policy Manual;

c.      Failure to reimburse Madisen and Amron for any and all subsequent customer payments on amounts which were previously chargedback and deducted from the Counter-Plaintiffs' commissions pursuant to Rule 4.1 of the Policy Manual;

d.      Acted in concert with its own subsidiaries including, but not limited to, Town Paper and Price and Pierce in a systematic effort to "mark up" the price of the products sold by Counter-Defendant to Counter-Plaintiffs' customers in order to reduce the commissions otherwise owed to the Counter-Plaintiffs.

15.    All of these activities by Gould were performed by Gould in a colluded effort to systematically deprive Madisen and Amron of the proper amount of commissions resulting in commissions owed to the Counter-Plaintiffs (the "Unpaid Commissions").

16.    Otherwise, any and all conditions precedent to the filing of this Counterclaim have been performed or satisfied by the Counter-Plaintiffs.

17.    The Counter-Plaintiffs have engaged the services of the law firm of Silverberg & Weiss, P.A. and have agreed to pay a reasonable attorney fee for their services.

## COUNT ONE
## Breach of Contract

The Counter-Plaintiffs sue the Counter-Defendant for Breach of Contract and reallege and reaver the allegations in paragraphs 1-17 above, and does state:

18.    Prior to April 1, 2005, both Madisen and Amron were paid a sales commission of 40% of all sales.

19.    On or about April 1, 2005, both Madisen and Amron entered into an oral agreement with Gould for the payment of sales commissions in the following manner:  Madisen and Amron would be paid 40% of all direct or indirect sales and both Madisen and Amron would be paid 30% of all warehouse sales regardless of location.

20.    Counter-Plaintiffs disassociated from Gould in or about June, 2006. Subsequently, Counter-Plaintiffs discovered a pattern of activity by Gould which was designed by Gould to improperly reduce, and deduct from, the commissions paid to Madisen and Amron. These activities include, but are not limited to:

a.    Failure to reimburse Madisen and Amron for any and all subsequent customer payments on amounts which were previously chargedback and deducted from the Counter-Plaintiffs' commissions pursuant to Rule 4.3 of the Policy Manual;

b.    Failure to reimburse Madisen and Amron for any and all interest which was deducted from the Counter-Plaintiffs' commission after chargeback and subsequent customer payment pursuant to Rule 4.1 and 4.3 of the Policy Manual;

c.    Failure to reimburse Madisen and Amron for any and all subsequent customer payments on amounts which were previously chargedback and deducted from the Counter-Plaintiffs' commissions pursuant to Rule 4.1 of the Policy Manual;

d.    Acted in concert with its own subsidiaries including, but not limited to, Town Paper and Price and Pierce in a systematic effort to "mark up" the price of the products sold by Counter-Defendant to Counter-Plaintiffs' customers in order to reduce the commissions otherwise owed to the Counter-Plaintiffs.

21.    All of these activities by Gould were performed by Gould in a colluded effort to systematically deprive Madisen and Amron of the proper amount of commissions resulting in the Unpaid Commissions.

22.    As a result of these activities by Gould, which were designed to systematically deprive Madisen and Amron of the proper amount of commissions resulting in the Unpaid Commissions, Gould has breached the agreement with Counter-Plaintiffs.

23.     Gould has failed and refused to pay Madisen and Amron the Unpaid Commissions.

24.     As a result of Gould's failure to pay the Unpaid Commission, the Counter-Plaintiffs are and continue to be damages.

WHEREFORE the Counter-Plaintiffs pray for an judgment against Gould for damages and costs, plus any other such relief as this Court deems right and just.

## COUNT TWO
## VIOLATION OF NEW YORK LABOR LAW § 191-C

The Counter-Plaintiffs sue the Counter-Defendants for a violation of New York Labor Law § 191-C and reallege and reaver the allegations in paragraphs 1-17 above, and does state:

25.     Prior to April 1, 2005, both Madisen and Amron were paid a sales commission of 40% of all sales.

26.     On or about April 1, 2005, both Madisen and Amron entered into an oral agreement with Gould for the payment of sales commissions in the following manner: Madisen and Amron would be paid 40% of all direct or indirect sales and 30% of all warehouse sales regardless of location.

27.     The Counter-Plaintiffs became disassociated from Gould in or about June, 2006. Subsequently, Counter-Plaintiffs discovered a pattern of activity by Gould which was designed by Gould to improperly reduce, and deduct from, the commissions paid to Madisen and Amron. These activities include, but are not limited to:

a.      Failure to reimburse Madisen and Amron for any and all subsequent customer payments on amounts which were previously chargeback and deducted from the Counter-Plaintiffs' commissions pursuant to Rule 4.3 of the Policy Manual;

CASE NO. 07 CIV 6087
JUDGE CHIN

b. Failure to reimburse Madisen and Amron for any and all interest which was deducted from the Counter-Plaintiffs' commission after chargeback and subsequent customer payment pursuant to Rule 4.1 and 4.3 of the Policy Manual;

c. Failure to reimburse Madisen and Amron for any and all subsequent customer payments on amounts which were previously chargeback and deducted from the Counter-Plaintiffs' commissions pursuant to Rule 4.1 of the Policy Manual; and

d. Acted in concert with its own subsidiaries including, but not limited to, Town Paper and Price and Pierce in a systematic effort to "mark up" the price of the products sold by Counter-Defendant to Counter-Plaintiffs' customers in order to reduce the commissions otherwise owed to the Counter-Plaintiff.

28. All of these improper activities by Gould were performed by Gould in a colluded effort to systematically deprive Madisen and Amron of the proper amount of commissions resulting in the Unpaid Commissions.

29. Section 191-C of the New York Labor Laws provide, in pertinent part, "[w]hen a contract between a principal and a sales representative is terminated, all earned commissions shall be paid within five business days after they become due…(3) A principal who fails to comply with the provisions of this section concerning timely payment of all earned commissions shall be liable to the sales representative in a civil action for <u>double damages</u>.  The prevailing party in such action shall be entitled to an award of reasonable attorneys' fees, court costs, and disbursements." (emphasis added).

30. Despite request, Gould failed and refused to pay Madisen and Amron the Unpaid Commissions in violation of Section 191-C of the New York Labor Laws.

31. As a result of Gould refusal to pay Madisen and Amron the unpaid commissions, they are and continue to be damaged.

WHEREFORE the Counter-Plaintiff's pray for an judgment from this Court against Gould in an amount of the Unpaid Commissions, plus double damages pursuant to New York Labor Law Section 191-C, interest, plus reasonable attorney's fees and costs pursuant to that statute, and other such relief as this Court deems just and right.

### COUNT THREE
### FRAUD

The Counter-Plaintiffs sue the Counter-Defendants for Fraud and reallege and reaver the allegations in paragraphs 1-17 above, and does state:

32.    Prior to April 1, 2005, both Madisen and Amron were entitled to a 40% sales commission from Gould.

33.    On or about April 1, 2005, both Madisen and Amron entered into the oral agreement with Gould for the payment of sales commissions in the following manner:  40% of all direct or indirect sales and 30% of all warehouse sales regardless of location.

34.    The Counter-Plaintiffs became disassociated from Gould in or about June, 2006. Madisen and Amron discovered a pattern of activity by Gould which was designed by Gould to improperly reduce, and deduct from, the commissions paid to Madisen and Amron.  These activities include, but are not limited to:

a.    Failure to reimburse Madisen and Amron for any and all subsequent customer payments on amounts which were previously chargedback and deducted from the Counter-Plaintiffs' commissions pursuant to Rule 4.3 of the Policy Manual;

b.    Failure to reimburse Madisen and Amron for any and all interest which was deducted from the Counter-Plaintiffs' commission after chargeback and subsequent customer payment pursuant to Rule 4.1 and 4.3 of the Policy Manual;

c.      Failure to reimburse Madisen and Amron for any and all subsequent customer payments on amounts which were previously chargeback and deducted from the Counter-Plaintiffs' commissions pursuant to Rule 4.1 of the Policy Manual; and

d.      Acted in concert with its own subsidiaries including, but not limited to, Town Paper and Price and Pierce in a systematic effort to "mark up" the price of the products sold by Counter-Defendant to Counter-Plaintiffs' customers in order to reduce the commissions otherwise owed to the Counter-Plaintiffs.

35.     All of these activities by Gould were performed by Gould in a colluded effort to systematically deprive Madisen and Amron of the proper amount of commissions resulting in the Unpaid Commissions.

36.     At the time Gould first entered into the commission structure with the Counter-Plaintiffs, it misrepresented a material fact in how commissions would be paid to the Counter-Plaintiffs, inasmuch as it did not reveal the systematic pattern of depriving the Counter-Plaintiffs of their commissions.

37.     At the time Gould entered into the commission structure with the Counter-Plaintiffs, it had knowledge that it was misrepresenting how commissions would be paid to the Counter-Plaintiffs, inasmuch as it knew it was not revealing the systematic pattern of depriving the Counter-Plaintiffs of their commissions in an attempt to induce the Counter-Plaintiffs to enter into the commission structure.

38.     At the time Gould entered into the Commission Structure with the Counter-Plaintiffs, it knew that the Counter-Plaintiffs would rely on the representations without the knowledge of Gould's systematic pattern of depriving the Counter-Plaintiffs of their commissions.

39.    At the time Gould entered into the commission structure with the Counter-Plaintiffs, the Counter-Plaintiffs did rely on Gould's representations of how commissions would be paid to the Counter-Plaintiffs.

40.    As a result of Counter-Plaintiffs' reliance on the representations of Gould, the Counter-Plaintiffs have been damages via the Unpaid Commissions.

WHEREFORE the Counter-Plaintiffs pray for a judgment against Gould for damages and costs, interest, plus any other such relief as this Court deems right and just.

## COUNT FOUR
## CONVERSION

The Counter-Plaintiffs sue the Counter-Defendant for conversion and reallege and reaver the allegations in paragraphs 1-17 above, and does state:

41.    Prior to April 1, 2005, both Madisen and Amron were entitled to a 40% sales commission from Gould.

42.    On or about April 1, 2005, both Madisen and Amron entered into an oral agreement with Gould for the payment of sales commissions in the following manner:  40% of all direct or indirect sales and 30% of all warehouse sales regardless of location.

43.    The Counter-Plaintiffs became disassociated from Gould in or about June, 2006. Madisen and Amron discovered a pattern of activity by Gould which was designed by Gould to improperly reduce, and deduct from, the commissions paid to Madisen and Amron.  These activities include, but are not limited to:

a.    Failure to reimburse Madisen and Amron for any and all subsequent customer payments on amounts which were previously chargedback and deducted from the Counter-Plaintiffs' commissions pursuant to Rule 4.3 of the Policy Manual;

b.      Failure to reimburse Madisen and Amron for any and all interest which was deducted from the Counter-Plaintiffs' commission after chargeback and subsequent customer payment pursuant to Rule 4.1 and 4.3 of the Policy Manual;

c.      Failure to reimburse Madisen and Amron for any and all subsequent customer payments on amounts which were previously chargeback and deducted from the Counter-Plaintiffs' commissions pursuant to Rule 4.1 of the Policy Manual; and

d.      Acted in concert with its own subsidiaries including, but not limited to, Town Paper and Price and Pierce in a systematic effort to "mark up" the price of the products sold by Counter-Defendant to Counter-Plaintiffs' customers in order to reduce the commissions otherwise owed to Counter-Plaintiff.

44.     All of these activities by Gould were performed by Gould in a colluded effort to systematically deprive Madisen and Amron of the proper amount of commissions resulting in the Unpaid Commissions.

45.     The Unpaid Commissions are, and should be, the rightful property of the Counter-Plaintiffs.

46.     Despite request from the Counter-Plaintiffs to return the Unpaid Commissions, Gould has failed and refused to do so, thus permanently depriving the Counter-Plaintiffs of the continued use of their Unpaid Commissions.

47.     As a result of Gould's refusal to return the Unpaid Commissions to the Counter-Plaintiffs, the Counter-Plaintiffs are and continue to be damaged.

WHEREFORE the Counter-Plaintiffs pray for a judgment against Gould for damages and costs, interest, plus any other such relief as this Court deems right and just.

## COUNT FIVE
## ABUSE OF PROCESS

The Counter-Plaintiffs sue the Counter-Defendants for conversion and reallege and reaver the allegations in paragraphs 1-17 above, and does state:

48.     In addition to the commission structure and oral agreement, the Policy Manual also governs how certain situations with regard to commissions should be handled.  It provides in pertinent part, in Policy 1.3:

> Whenever a salesperson leaves the company and the account is transferred to another salesperson, the company will be made whole regarding any outstanding claims, chargebacks, receivables, etc. before the new salesperson receives any commission.  For example, if there is a chargeback for $500 and it is a price deduction, the company will deduct from the total gross profit of sales of the transferred account until the $500 is reached.  The new salesperson will then receive commission on all subsequent sales

49.     In other words, Gould's policy is once a sales person becomes disassociated with Gould, the transferee/subsequent sales person is responsible for any and all claims (deductions/amounts due Gould) upon that commission.

50.     Gould knew or should have known of its own internal policy (Policy 1.3) regarding the transfer of accounts subsequent to the disassociation of a salesperson.

51.     On or about February 11, 2008, Gould filed the underlying lawsuit against the Defendants/Counter-Plaintiffs seeking the reimbursement of commission.

52.     The Defendants/Counter-Plaintiffs were served with process regarding the underlying lawsuit.

53.     As Gould knew or should have known of its own internal policy (Policy 1.3) regarding the transfer of accounts subsequent to the disassociation of a salesperson, it also knew

that it was attempting to collect an invalid alleged debt against the Defendants/Counter-Plaintiffs.

54.    Gould had knowledge that it was attempting to collect an invalid alleged debt from the Defendants/Counter-Plaintiffs at the time it served them with process.

55.    Gould's use of process in this improper manner was designed to do harm to the Defendants/Counter-Plaintiffs without excuse or justification in order to obtain an improper purpose.

56.    Gould's use of process in this improper manner has damaged the Defendants/Counter-Plaintiffs including, but not limited to, the payment of legal fees in having to defend the action against them.

WHEREFORE, the Counter-Plaintiffs pray for a judgment against Gould for damages, reasonable attorney's fees, interest and costs, plus any other such relief as this Court deems right and just.

*Respectfully submitted*,

SILVERBERG & WEISS, P.A.
Admitted *Pro Hoc Vice*
*Attorneys for Defendants/Counter-Plaintiffs*
2665 Executive Park Drive, Suite 2
Weston, Florida  33331
Telephone:  (954) 384-0998
Facsimile:  (954) 384-5390

By: s/Paul K. Silverberg
        Paul K. Silverberg

CASE NO. 07 CIV 6087
JUDGE CHIN

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed using the ECF Electronic Filing System and provided using the same method of transmission to  Jack Hassid, Esq., 460 Park Avenue, 10th Floor, New York, New York  10022 this 11[st] day of March, 2008.

By: *s/Paul K. Silverberg*
Paul K. Silverberg